## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CYNTHIA LEIGH COLE,           )
                              )
            Plaintiff,        )
                              )
      v.                      )        1:19CV1161
                              )
ANDREW M. SAUL,               )
Commissioner of Social Security, )
                              )
            Defendant.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Cynthia Leigh Cole, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 11, 16; see also Docket Entry 12 (Plaintiff's Brief); Docket Entry 17 (Defendant's Memorandum); Docket Entry 18 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI (Tr. 376-84, 398-415), alleging disability since July 9, 2016 (see Tr. 378, 398). Following denial of those applications initially (Tr. 203-54, 307-10) and on reconsideration (Tr. 255-304, 313-26), Plaintiff

requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 336-37). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 138-71.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 107-28.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-8, 375, 539-40), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through September 30, 2021.

2. [Plaintiff] has not engaged in substantial gainful activity since July 9, 2016, the alleged onset date.

. . .

3. [Plaintiff] has the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease of lumbar spine; peripheral neuropathy; bilateral carpal tunnel syndrome [("CTS")]; status post crush injury left hand; seizure like activity; fibromyalgia; post-traumatic stress disorder (PTSD); personality disorder; depression; anxiety; attention deficit and hyperactivity disorder (ADHD); and substance abuse disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to: lift/carry 20 pounds occasionally and 10

2

pounds frequently; sit for six hours in an eight hour
workday; stand and walk for six hours in an eight hour
workday; no operation of foot controls; occasional
climbing of ramps or stairs but may never climb ladders,
ropes or scaffolds; occasional balancing, stooping,
kneeling and crouching; no crawling; frequent forward,
lateral and overhead reaching; frequent handling and
fingering; no exposure to very loud noise as defined by
[Selected Characteristics of Occupations in the
Dictionary of Occupational Titles ("SCO")] code; no
exposure to extreme bright lighting; no exposure to
hazardous machinery or unprotected heights; able to
understand, remember in [sic] carryout simple tasks; no
fast-paced production; low stress work defined as only
occasional decision-making and only occasional changes in
the work setting; occasional interaction with coworkers
and supervisors; and no interaction except incidental
with the public.

. . .

6. [Plaintiff] is unable to perform any past relevant
work.

. . .

10. Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [she] can perform.

. . .

11. [Plaintiff] has not been under a disability, as
defined in the . . . Act, from July 9, 2016, through the
date of this decision.

(Tr. 112-28 (bold font and internal parenthetical citations

omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security

Commissioner's denial of social security benefits." Hines v.

Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope

3

of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as

4

adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-

---

[1] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

5

vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro,

_____

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

_____

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in
(continued...)

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "remand is required because the ALJ failed to include limitations related to [Plaintiff]'s admittedly severe bilateral [CTS], left hand crush injury, and cervical degenerative disc disease in [the RFC] finding and hypothetical question to the [VE]" (Docket Entry 12 at 3; see also id. at 3-7; Docket Entry 18 at 1-2); and

2) "remand is required because the ALJ committed significant legal errors in evaluating the medical opinion evidence of record, including failing to adopt or reject limitations described by sources whose opinions he found credible and relying upon outdated state agency consultants' opinions" (Docket Entry 12 at 3; see also id. at 7-11; Docket Entry 18 at 2-5).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 17 at 5-25.)

### 1. Limitations Arising out of Neck and Hand Impairments

Plaintiff's first assignment of error asserts that "remand is required because the ALJ failed to include limitations related to

---

[4] (...continued)
the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

[Plaintiff]'s admittedly severe bilateral [CTS], left hand crush injury, and cervical degenerative disc disease in [the RFC] finding and hypothetical question to the [VE]." (Docket Entry 12 at 3; see also id. at 3-7; Docket Entry 18 at 1-2).) In particular, Plaintiff maintains that "[t]he only 'limitation' even arguably related to [Plaintiff]'s severe bilateral [CTS] and left hand crush injury was a restriction to 'frequently handling and fingering'" (Docket Entry 12 at 4 (quoting Tr. 116)) which, Plaintiff argues, amounts to "essentially no limitation at all . . . [because 'f]requently' means doing an activity from 1/3 to 2/3 of the time" (id. (citing, inter alia, Dictionary of Occupational Titles ("DOT"), App'x C ("Components of the Definition Trailer"), 1991 WL 688702 (G.P.O. 4th ed. rev. 1991))). Plaintiff further points out that, "[w]ith respect to [Plaintiff]'s admittedly severe cervical impairment, the only limitation adopted by the ALJ was 'frequent forward, lateral and overhead reaching'" (id. (quoting Tr. 116)), which Plaintiff deems "not an actual limitation" because it meant that Plaintiff "could reach in any direction bilaterally up to 2/3 of the day" (id.). According to Plaintiff, "[t]he medical evidence supports the ALJ's [step two severity] finding that [Plaintiff] had significant limitations on her ability to use her hands" (id. (citing Tr. 113, 188, 799, 1078, 1573)), as well as "significant limitations related to her cervical impairment" (id. at 5 (citing Tr. 173, 833, 1075, 1085, 1820, 1875)), and that her "symptoms and signs continued after her left carpal tunnel surgery" (id. at 4

9

(citing Tr. 17-18, 173, 1169-70, 1295, 1301, 1820, 1823)).[5]  In that regard, Plaintiff argues that the record supports a restriction to only occasional bilateral handling and fingering (see id. at 4), as well as restrictions on Plaintiff's cervical range of motion and to only occasional overhead reaching (see id. at 6), which would preclude the jobs cited by the VE and adopted by the ALJ at step five of the SEP (see id. 4, 5; see also Tr. 127, 169).

RFC measures the most a claimant can do despite any physical and mental limitations.  Hines, 453 F.3d at 562; 20 C.F.R. §§ 404.1545(a), 416.945(a).  An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain.  See Hines, 453 F.3d at 562-63; 20 C.F.R. §§ 404.1545(b), 416.945(b).  The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e.,

---

[5] In support of her argument that the record supports greater limitations arising out of her hand and neck impairments than the RFC provides, Plaintiff misrelies on evidence that her counsel sent to the Appeals Council.  (See Docket Entry 12 at 4 (citing Tr. 17-18 (operative note of right carpal tunnel release surgery on 9/12/19), 173 (EMG/NCV test on 8/21/19)); see also id. at 5 (citing Tr. 173)).  Concerning the surgical record, the Appeals Council "f[ou]nd th[at] evidence d[id] not show a reasonable probability that it would change the outcome of the decision" and, regarding the EMG/NCV, found that "evidence d[id] not relate to the period at issue[ and, t]herefore, it d[id] not affect the decision about whether [Plaintiff] w[as] disabled beginning on or before July 24, 2019."  (Tr. 2.)  As a result of those findings, the Appeals Council did not exhibit that evidence (see Tr. 6-7), and it does not constitute a part of the administrative record properly before this Court.  Although Plaintiff also cites to transcript page 188, which Plaintiff's counsel sent to the Appeals Council and which reflects treatment by hand specialist Dr. Kevin Robert Kuzma on February 26, 2018 (see Docket Entry 12 at 4 (citing Tr. 188)), that record actually appears in an exhibit that the ALJ considered (see Tr. 1091).

10

sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. §§ 404.1567, 416.967. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. §§ 404.1569a(c), 416.969a(c). An ALJ need not discuss every piece of evidence in making an RFC determination. See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).

As an initial matter, Plaintiff's argument that "[t]he only 'limitation' even arguably related to [Plaintiff]'s severe bilateral [CTS] and left hand crush injury was a restriction to 'frequently handling and fingering'" (Docket Entry 12 at 4 (quoting Tr. 116)) glosses over the ALJ's inclusion in the RFC of a limitation to <u>light</u> exertional work (<u>see</u> Tr. 116). That significant limitation restricted Plaintiff to lifting, carrying, pushing, and pulling a maximum of 20 pounds occasionally and ten pounds frequently, <u>see</u> 20 C.F.R. §§ 404.1567(b), 416.967(b), and precluded all but one of Plaintiff's prior jobs at step four of the SEP (<u>see</u> Tr. 126).[6]

---

[6] The ALJ adopted the VE's testimony that the RFC's limitation to simple tasks precluded the remaining job of security guard (light exertion with a Specific Vocational Preparation ("SVP") of 3). (<u>See</u> Tr. 126, 165, 167.)

Moreover, the ALJ's evaluation of Plaintiff's subjective symptom reporting supports the ALJ's finding that, despite Plaintiff's severe hand and neck impairments (see Tr. 113), she could perform light work involving <u>frequent</u> handling, fingering, and reaching (see Tr. 116). In that regard, the ALJ expressly acknowledged Plaintiff's testimony that she suffered from "constant pain in her neck," that she had "difficulty moving her neck and fingers of her hands," as well as "that she ha[d] debilitating deficits in most areas of physical activities." (Tr. 117.) However, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely credible for the reasons explained in th[e ALJ's] decision." (<u>Id.</u>)[7] In support of that finding, the ALJ

---

[7] Although not argued by Plaintiff (see Docket Entries 12, 18), the ALJ's finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely <u>credible</u>" (Tr. 117 (emphasis added)) fails to follow Social Security Ruling 16-3p, <u>Titles II and XVI: Evaluation of Symptoms in Disability Claims</u>, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"). SSR 16-3p "eliminat[ed] the use of the term 'credibility' from . . . sub-regulatory policy, . . . [and] clarif[ied] that subjective symptom evaluation is not an examination of [a claimant]'s character." SSR 16-3p, 2017 WL 5180304, at *1 (emphasis added). However, any error by the ALJ in that regard remains harmless under the circumstances of this case. <u>See generally</u> <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Despite the ALJ's use of the term "credible" in his finding quoted above (Tr. 117), at the outset of the RFC analysis, the ALJ stated that he had "considered all symptoms and <u>the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence</u>, based on the requirements of . . . <u>SSR 16-3p</u>" (Tr. 116 (emphasis added)). Moreover, in other material portions of his subjective symptoms analysis, the ALJ adhered to SSR 16-3p's requirement that such analysis focus on "the extent to which [a claimant's] symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the [claimant's] record." SSR 16-3p, 2017 WL 5180304, at *2 (emphasis added). For example, in analyzing Plaintiff's daily activities, the ALJ stated that Plaintiff's "high functioning activities of daily living [we]re <u>inconsistent</u> with her physical and

(continued...)

highlighted inconsistencies between the Plaintiff's treatment history for her hand and neck impairments and her testimony:

> [Plaintiff]'s medical treatment history is inconsistent with her allegations of debilitating . . . bilateral hand pain with limited functioning . . . . She alleged having constant pain in her neck . . . with numbness, . . . and difficulty moving her neck and fingers of her hands. She had . . . left carpal tunnel release in March 2018, but no additional surgery was recommended. There is no indication [Plaintiff] attended physical therapy. She received pain management services, but was terminated due to positive urine drug screens. There is no indication she received injections for her . . . hands. . . . Diagnostic testing showed only mild findings in the left upper extremity. . . . There is no indication [Plaintiff] required medications that were not commonly used to treat her conditions, nor is there any indication aggressive or invasive treatments were required, or even recommended.

(Tr. 120-21.)

The ALJ additionally expanded his discussion of the inconsistencies between the record and Plaintiff's testimony regarding her drug use, which the ALJ believed demonstrated Plaintiff's non-compliance with treatment:

> [Plaintiff] strongly contended at the hearing that she was never addicted to drugs. However, the record documents her participation in a Suboxone program. [Plaintiff] admitted to symptoms of withdrawal; cocaine use to escape mental health symptoms and [to] self-medicate for ADHD; and occasional marijuana use. The record documents positive urine drug screens for cocaine and Oxycodone, when the medication was not prescribed. There is also evidence of an instance suggestive of drug seeking behavior, as [Plaintiff]

---

[7] (...continued)
mental allegations of disability." (Tr. 224 (emphasis added).) Similarly, the ALJ observed that Plaintiff's "medical treatment history [wa]s inconsistent with her allegations" (Tr. 120 (emphasis added)) and that her "routine and conservative mental health treatment history [wa]s inconsistent with her allegations" (Tr. 123 (emphasis added)).

13

failed to appear for a doctor's appointment after being advised she would be not prescribed opiates [(Tr. 1896-97)]. [Plaintiff]'s drug use is not material, as she would still be capable of work activity consistent with the [RFC] finding, even considering her drug use. However, this evidence is relevant to [Plaintiff]'s substance abuse impairments and apparent non-compliance with physical and mental health treatment.

(Tr. 124.)

The ALJ also found that Plaintiff's daily activities did not harmonize with her allegations of disabling hand and neck impairments:

[Plaintiff]'s high functioning activities of daily living are inconsistent with her physical . . . allegations of disability. . . . [S]he performs personal care independently[,] prepares meals, does some cleaning and laundry, manages money, and cares for and socializes with her son [(Tr. 465-80, 1066-73)]. She asserted she went Christmas shopping [(Tr. 863)]. There is also evidence in the record that [Plaintiff] cleaned out an old house [(Tr. 1750)]. More importantly, [Plaintiff] was able to sustain periods of work activity, and in February 2019, she asserted she was able to hold a job and complete tasks at work and at home [(Tr. 1617)]. [Plaintiff]'s ability to participate in such activities undermines the persuasiveness of her allegations of disabling functional limitations.

(Tr. 124.) The ALJ's evaluation of Plaintiff's subjective symptom reporting thus provides substantial evidence to support his handling, fingering, and reaching limitations in the RFC and, significantly, Plaintiff did not challenge any of that analysis by the ALJ (see Docket Entries 12, 18).

Second, by merely pointing to record evidence Plaintiff believes supported greater limitations on her abilities to handle, finger, and reach (see Docket Entry 12 at 4-5 (citing Tr. 188, 799,

14

833, 1075, 1078, 1085, 1169-70, 1295, 1301, 1573, 1820, 1823, 1875)), she misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's findings regarding Plaintiff's abilities to handle, finger, and reach, and not whether other record evidence weighed against those findings, see Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

Here, the ALJ also discussed the following objective medical evidence relating to Plaintiff's hand and neck impairments during the relevant time period:

- "[d]uring examination on July 1, 2016, [Plaintiff] reported improved left upper extremity pain, with only intermittent complaints of left hand numbness and weakness . . . [and] Dr. [Henry A.] Pool found normal sensation, motor strength and tone in the bilateral upper . . . extremities" (Tr. 118 (emphasis added));

- "[w]hen seen on November 15, 2016, [Plaintiff] alleged increased left forearm and hand pain, loosely corresponding to a median nerve distribution[; h]owever, Dr. Pool found normal deep tendon reflexes[,] . . . sensation, coordination, muscle strength and tone in the bilateral upper . . . extremities" (Tr. 119);

15

- "EMG of the upper extremities dated January 12, 2017 showed only <u>mild</u> left ulnar neuropathy at the elbow . . . and there was <u>no</u> evidence for cervical radiculopathy, brachia] plexopathy, peripheral polyneuropathy or median neuropathy in either upper extremity" (Tr. 118 (emphasis added));

- on September 27, 2017, Dr. Pool found Plaintiff's "[s]ensation was decreased at the left C8" and "4-/5 left finger extensor" strength, but otherwise "<u>normal</u> sensation, coordination, [and] muscle strength and tone in the bilateral upper . . . extremities" as well as <u>normal</u> deep tendon reflexes (Tr. 119 (emphasis added));

- "MRI of the cervical spine dated October 5, 2017 showed anterior cervical fusion from C4 through T1 <u>without failure or complication</u>. There was bilateral foraminal stenosis at C7-T1 and a broad based disc bulge with <u>mild</u> bilateral foraminal narrowing at C3-4, but <u>no</u> central canal stenosis. EMG and nerve conduction studies of upper extremities completed in October 2017 were <u>normal</u>." (<u>id.</u> (emphasis added) (internal parenthetical citations omitted));

- on January 11, 2018, consultative medical examiner Dr. Mark L. Fields documented "tenderness of the paracervical muscles of neck with . . . limited range of motion," "positive carpal compression and Phalen's in the bilateral upper extremities[,] diffuse tenderness of the bilateral shoulders, elbows, wrists and hands[,] decreased sensation to touch of left upper . . . extremit[y]," and inability "to manipulate buttons, door knobs or pinch with [the] left hand"; however, Dr. Fields also recorded "no evidence of edema, effusion, erythema, crepitus, cyanosis or warmth of upper . . . extremities," as well as that "[r]adial . . . pulses were 2+ bilaterally[,] <u>grip strength and upper extremity strength was -5/5</u>[,] the cranial nerves were grossly intact[,] there were <u>no motor deficits</u>[,] and [Plaintiff] was <u>able to write</u> with her dominant right hand" (Tr. 119 (emphasis added));

- following left carpal tunnel release on March 29, 2018, orthopedic hand specialist Dr. Kevin Robert Kuzma examined Plaintiff on May 16, 2018, and noted

16

"mild swelling of left hand, compared to the right and it had a pinker color," but also found "intact sensation and capillary refill of the fingertips" as well as that Plaintiff "could flex and extend the IP joint of the thumb and oppose her thumb to the small finger" and that "[t]he wound was fully healed" (id. (emphasis added));

- "[c]ervical x-ray dated October 12, 2018 showed an adjacent segment degeneration at the C3-4 level. However, there was normal sagittal alignment and solid fusion at all levels without evidence of loosening of the screws migration of the place or subsidence of the cage" (Tr. 118 (emphasis added)); and

- "EMG and nerve conduction completed on October 18, 2018 showed mild left ulnar mononeuropathy at the elbow without denervation" (id. (emphasis added)).

That analysis, along with the ALJ's evaluation of Plaintiff's subjective symptom reporting discussed above, provides substantial evidence to support the ALJ's finding that, despite severe hand and neck impairments (see Tr. 113), Plaintiff retained the RFC to perform light work with frequent handling, fingering, and reaching (see Tr. 116).

The ALJ's consideration and weighing of the opinion evidence further supports the RFC's restriction to frequent handling and fingering. The state agency medical consultants' opinions – which the ALJ found "persuasive" as "well-supported" by the record (Tr. 124) - included the initial-level consultant's assessment of no limitations on Plaintiff's ability to handle and finger (see Tr. 219, 244), and the reconsideration-level consultant's restriction of Plaintiff to frequent handling and fingering due to her left

carpal tunnel release surgery approximately one month earlier (see Tr. 270-72, 294-96).

With regards to reaching, Plaintiff faults the ALJ for finding the state agency medical consultants' opinions "'persuasive'" but then not adopting their limitation to only <u>occasional</u> bilateral overhead reaching. (Docket Entry 12 at 6 (citing Tr. 116, 124, 220, 271); <u>see also</u> Docket Entry 18 at 2.) According to Plaintiff, "where the ALJ does not adopt or reject the limitations offered by a medical source and does not explain his/her reasons for doing so, remand for further evaluation is required." (Docket Entry 18 at 2 (citing 20 C.F.R. §§ 404.1520c, 416.920c, and Social Security Ruling 96-8p, <u>Policy Interpretation Ruling Titles II and XVI: Assessing [RFC] in Initial Claims</u>, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 96-8p")).)

As an initial matter, the ALJ's reaching limitation qualifies as <u>both</u> more permissive and more restrictive than that of the consultants. (<u>Compare</u> Tr. 116, <u>with</u> Tr. 219-20, 244-45, 270-71, 294-95.) The ALJ's limitation to "<u>frequent</u>" reaching (Tr. 116 (emphasis added)) does not extend as far as the consultants' limitation to "<u>occasional</u>" reaching (Tr. 219-20, 244-45, 270-71, 294-95 (emphasis added)), but the ALJ's application of the reaching limitation to "<u>forward, lateral and overhead</u>" movements (Tr. 116 (emphasis added)) imposes greater restrictions than did the consultants, who limited their determination to only "<u>overhead</u>" reaching (Tr. 219-20, 244-45, 270-71, 294-95 (emphasis added)).

18

Moreover, Plaintiff's argument falters, because the ALJ's explanation of the weight he accorded to the state agency medical consultants' opinions sufficiently explains why he did not adopt the consultants' limitation to only <u>occasional</u> overhead reaching:

> The opinions of the state agency medical consultants, who opined [Plaintiff] was capable of light work activity, with occasional overhead reaching bilaterally and frequent handling and fingering, are persuasive, <u>with additional limitations based on the new evidence of record</u>. The opinions are well-supported [sic] orthopedic treatment notes showing <u>improvement after surgery</u>; imaging and physical examination findings by the consultative examiner, neurologist, orthopedic specialist and internist. [Plaintiff]'s activities of daily living, which include <u>part-time work activity and childcare</u> further support the state agency opinions.

(Tr. 124 (emphasis added) (internal parenthetical citations omitted).) The ALJ's statement that he included in the RFC "additional limitations based on the new evidence of record" signaled that, although he found the consultants' opinions "persuasive," he would not adopt their opinions verbatim due to "new evidence" received after the consultants offered their opinions. (<u>Id.</u>)

In particular, the ALJ cited two instances of such new evidence post-dating the consultants' opinions: 1) Plaintiff's "improvement after surgery" (<u>id.</u>) which occurred following her left carpal tunnel release on 3/29/18 (<u>see</u> Tr. 119-20; <u>see also</u> Tr. 1168-70, 1226, 1298, 1308), and 2) her "part-time work activity" (Tr. 124) which occurred in the summer of 2018 when Plaintiff worked as a <u>stocker</u> at Wal-Mart for over four months (<u>see</u> Tr. 144-

19

45; <u>see also</u> Tr. 112 (ALJ's remark that Plaintiff's "work activity demonstrates a much higher functioning than alleged")), and again in February 2019 when Plaintiff reported "she was working and able to hold her job," with "improved ability to complete tasks [] at work" (Tr. 123; <u>see also</u> Tr. 1617). The ALJ's citation to that evidence explains why the ALJ adopted different reaching limitations than the consultants.

In light of the foregoing analysis, Plaintiff's first assignment of error falls short.

## 2. Evaluation of Opinion Evidence

Next, Plaintiff asserts that "remand is required because the ALJ committed significant legal errors in evaluating the medical opinion evidence of record, including failing to adopt or reject limitations described by sources whose opinions he found credible and relying upon outdated state agency consultants' opinions." (Docket Entry 12 at 3; <u>see also</u> <u>id.</u> at 7-11; Docket Entry 18 at 2-5.) More specifically, Plaintiff faults the ALJ for finding "the opinions of every single examining and treating medical provider not to be persuasive" (Docket Entry 12 at 7 (citing Tr. 125-26)), and committing "significant legal errors" with respect to the evaluation of 1) the opinions of consultative psychological examiner Dr. Carla Duszlak (<u>see</u> <u>id.</u> at 7-8), 2) the opinions of treating orthopedists Drs. Adam S. Kendall and Dahari D. Brooks (<u>see</u> <u>id.</u> at 8-9), 3) the prior administrative findings of the state

20

agency medical consultants (see id. at 10), and 4) the prior administrative findings of the state agency psychological consultants (see id. at 10-11). None of those contentions carries the day.

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (see Tr. 376-84, 398-415)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. See 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[8] Instead, an ALJ must determine and "articulate in [the] . . . decision how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a

---

[8] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2017). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2017).

21

claimant's] case record." 20 C.F.R. §§ 404.1520c(b), 416.920c(b) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).[9] The ALJ must only address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion/finding, 20 C.F.R. §§ 404.1520c(c)(3)-(5), 416.920c(c)(3)-(5) — when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)3). The new regulations further deem "inherently neither valuable nor persuasive," 20 C.F.R.

---

[9] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

§§ 404.1520b(c), 416.920b(c), "[s]tatements on issues reserved to the Commissioner," 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3), such as statements that a claimant does not qualify as disabled or remains unable to work, 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i).

### 1. Dr. Duszlak's Opinions

First, Plaintiff deems the ALJ's rating of Dr. Duszlak's opinions as "not persuasive because [they were] 'predicated upon [Plaintiff]'s possible drug use, rather than the objective mental status evaluation' . . . a misinterpretation of Dr. Duszlak's examination report." (Docket Entry 12 at 7-8 (quoting Tr. 125; see also Docket Entry 18 at 4.)  According to Plaintiff, "Dr. Duszlak specifically diagnosed PTSD and panic disorder, in addition to substance abuse disorders," while "stat[ing] that [Plaintiff]'s difficulty relating to others was a result of her PTSD stemming from childhood trauma, not from substance abuse" (Docket Entry 12 at 8 (citing Tr. 1072)), and "stated that panic attacks would cause [Plaintiff] to have poor attendance at times" (id. (citing Tr. 1073)).  Plaintiff points out that even Dr. Duszlak's remark that it remained "'unclear how much of [Plaintiff's limitations] is due to true [ADHD] and how much of it may be related to anxiety, depression, or drug use' . . . did not attribute these limitations to substance abuse alone, but to a combination of depression and

23

anxiety (mental disorders) and substance abuse" (id. (quoting Tr. 1073)).

The ALJ evaluated the persuasiveness of Dr. Duszlak's opinions as follows:

> The opinion of consultative examiner, Carla Duszlak, M.D., who opined [Plaintiff] could perform simple repetitive task [sic] and interact with coworkers and the public, but that she did not focus well, she had a diminished ability to deal with stress, she would have poor attendance, and that she would require a representative payee is not persuasive. Dr. Duszlak [sic] opinion is predicated upon [Plaintiff]'s possible drug use, rather than the objective mental status evaluation. Moreover, <u>the opinion is not well-supported by the mental status examinations and psychiatric screenings in the record and her activities of daily living as previously mentioned in th[e ALJ's] decision</u>.

(Tr. 125 (emphasis added) (internal parenthetical citation omitted).) Plaintiff's contentions fall short for two reasons.

First, the ALJ did not err when he stated that Dr. Duszlak "predicated" her opinions on Plaintiff's "possible drug use, rather than the objective mental status evaluation." (Id.) Dr. Duszlak opined as follows:

> <u>[Plaintiff] seems to have a rather significant problem with substance use disorders. I suspect that she would rather resort to that than to really deal with some of her underlying psychological difficulties. Her prognosis is somewhat guarded therefore</u>. Psychotherapy and psychiatric care would likely help her to a degree. <u>I do see her major problem at this point as being substance use, however</u>. It is concerning that she takes as much Adderall as she does. That is a rather significant dose. As recently as 2015 the doctor indicates that she had only recently been prescribed Adderall and was taking none at that time. The dose has escalated dramatically from 0-60 mg a day. The fact that she cannot go without a few pills that dropped down the drain by accident and has to use cocaine to supplement her Adderall a month ago

24

indicates a problem both with Adderall and with cocaine,
I believe.

That does not even address her opioid problems.  She was
on a very significant amount of opioids, although she has
had two back surgeries.  She has been on Suboxone it
appears.  Today she seems to indicate to me that she is
taking no pain medicines but that she is going to be
going to the pain clinic tomorrow to start again.

She will need treatment beyond a year and her prognosis
is guarded at best.

**FUNCTIONAL     ASSESSMENT/MEDICAL     SOURCE     STATEMENT:**
[Plaintiff] should not manage funds because she is
obviously getting cocaine illicitly.

She can do simple and repetitive tasks only.  She does
not focus well.  It is not clear how much of this is due
to true [ADHD] and how much of it may be related to
anxiety, depression or drug use.

She can interact with coworkers and the public politely
but would likely have no eye contact as she did today.
She has diminished ability to deal with stress.  Panic
attacks could cause her to have poor attendance at times.

(Tr. 1073 (emphasis added).)  As the above-emphasized language

makes clear, Dr. Duszlak did attribute Plaintiff's "guarded"

prognosis, difficulties dealing with "underlying psychological

issues," and inability to manage funds to her apparent "rather

significant" substance abuse issues.  (Id.)  Dr. Duszlak's opinion

also lacks clarity as to whether Plaintiff's lack of focus arose

from mental conditions such as ADHD, anxiety, and/or depression, or

from her drug use.  As such, the ALJ did not err in discounting Dr.

Duszlak's opinions based on issues related to Plaintiff's "possible

drug use" (Tr. 125).

25

Second, the ALJ also found Dr. Duszlak's opinions lacked persuasiveness as "not well-supported by the mental status examinations and psychiatric screenings in the record and [Plaintiff's] activities of daily living" (id.), a finding not challenged by Plaintiff (see Docket Entries 12, 18). That (unchallenged) alternative basis for the ALJ's decision forecloses relief.

## 2. Opinions of Drs. Kendall and Brooks

Next, Plaintiff faults the ALJ for recognizing that Drs. Kendall and Brooks both "limited [Plaintiff] to less than sedentary work" but "fail[ing] to note the consistency of these two treating physicians' opinions" with each other. (Docket Entry 12 at 8 (citing Tr. 125, and referencing Tr. 1298, 1302); see also Docket Entry 18 at 4-5.) Plaintiff deems "significant" the fact "that 'consistency' is defined to include consistency with 'evidence from other medical sources.'" (Docket Entry 12 at 9 (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)).)[10]

The ALJ considered the persuasiveness of the opinions of Drs. Kendall and Brooks in the following manner:

---

[10] Plaintiff also maintains that the ALJ "failed to comply with the long-standing position of this Court, which holds that the opinions of treating physicians are entitled to significant deference, if not controlling weight" (Docket Entry 12 at 9), and notes that "the Fourth Circuit has long held that a treating physician's opinion is entitled to 'great weight, and may be disregarded only if there is persuasive contradictory evidence'" (id. (quoting Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987))). However, as discussed above, the new regulations make clear that that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (emphasis added).

26

The opinion of Adam Kendall, M.D., who opined [Plaintiff] was limited to <u>light work duties, with no use of the left arm, no overhead lifting, and lifting no more than 5 pounds</u> is not persuasive [(Tr. 1302)]. These restrictions were implemented just after surgery and are unsupported by the physician's own examination findings; diagnostic imaging and testing; physical examination findings from orthopedic, internal and neurology specialists; as well as [Plaintiff]'s activities of daily living, which include household chores, child care and work activity.

The October 2018 opinion of Dhahari Brooks, M.D., who opined [Plaintiff] was limited to <u>sedentary work</u>, is not persuasive [(Tr. 1298)]. The opinion is largely based on [Plaintiff]'s subjective complaints and unsupported by the physician's own physical examination findings, which includes [sic] no focal deficits; negative Babinski's and Hoffman; normal gait pattern and no clonus; 2+ deep tendon reflexes in the upper extremities symmetrically; and no significant shoulder pain with range of motion. Moreover, Dr. Brooks concluded, based on objective findings, there was no clinical evidence to suggest a true cervical radiculopathy or myelopathy and that surgical intervention [sic] not warranted [(<u>id.</u>)]. The opinion is further inconsistent with diagnostic imaging and testing; physical examination findings from orthopedic, internal and neurology specialists; as well as [Plaintiff]'s activities of daily living, which include household chores, child care and work activity.

(Tr. 125-26 (emphasis added) (internal parenthetical citation omitted).)

Plaintiff's contentions fail, because the opinions in question actually <u>lack</u> consistency with each other. As emphasized above, Dr. Kendall limited Plaintiff to lifting a maximum of <u>five</u> pounds and precluded <u>overhead lifting</u> and <u>use of her left arm</u> (<u>see</u> Tr. 1302), while Dr. Brooks limited Plaintiff to <u>sedentary</u> work, which entails lifting a maximum of <u>ten</u> pounds, <u>see</u> 20 C.F.R. §§ 404.1567(a), 416.967(a), and Dr. Brooks did not include <u>any</u>

27

limitations on overhead lifting or use of the left arm (see Tr. 1298). Moreover, the ALJ also discounted the opinions of Drs. Kendall and Brooks because they lacked support from the physicians' own findings, as well as because they did not harmonize with other evidence in the record, including Plaintiff's daily activities (see Tr. 125-26), and Plaintiff did not challenge that aspect of the ALJ's analysis (see Docket Entries 12, 18).

## 3. Prior Administrative Findings of State Agency Medical Consultants

Plaintiff additionally asserts error in the ALJ's "rel[iance] upon the outdated opinions of the state agency physicians." (Docket Entry 12 at 10 (citing Tr. 124).) In that regard, Plaintiff observes that "the ALJ's decision turns largely upon [Plaintiff]'s alleged improvement after left carpal tunnel release surgery" (id. (citing Tr. 124-25)), but notes that the consultants neither "reviewed any records after this surgery . . . nor . . . any records related to [Plaintiff]'s blackout spells, diagnosed as possible seizures" (id. (citing Tr. 87-99, 100-01, 200-01, 1265-68)) and "EMG studies performed in October 2018" (id. (citing Tr. 1822-23)).[11] Plaintiff thus posits that "[t]he ALJ erred in

_____

[11] Plaintiff's argument that the state agency medical consultants' opinions lack probative weight because the consultants did not review records relating to Plaintiff's "right carpal tunnel syndrome, leading to a second surgery in September 2019" (Docket Entry 12 at 10 (citing Tr. 14-18)) and "EMG studies performed in . . . August 2019 (id. (citing Tr. 173)) misses the mark. Plaintiff's counsel submitted that evidence to the Appeals Council after the ALJ issued his decision. (See Tr. 9, 172.) Regarding the evidence of Plaintiff's right CTS and release surgery, the Appeals Council "f[ou]nd th[at] evidence d[id] not show a reasonable probability that it would change the outcome of the
(continued...)

28

relying upon the outdated opinions of state agency medical consultants who reviewed only a small portion of the medical evidence of record." (<u>Id.</u> (citing <u>Morales v. Apfel</u>, 225 F.3d 310, 319-20 (3d Cir. 2000), and <u>Jelinek v. Astrue</u>, 662 F.2d 805, 812 (7th Cir. 2011)).)

As discussed above, the ALJ recognized that the state agency medical consultants did not have the opportunity to review evidence that post-dated their opinions and found "additional limitations based on new evidence in the record." (Tr. 124.) Consistent with that statement, the ALJ's RFC 1) precluded foot controls, 2) added limitations on Plaintiff's exposure to very loud noise, extreme bright lights, and hazards to account for her allegations of seizures/blackout spells, 3) increased restrictions on postural movements, and 4) altered the consultants' reaching restriction from occasional overhead reaching to frequent forward, lateral, and overhead reaching. (<u>See</u> Tr. 116.) Plaintiff has failed to show any error in that regard.

## 4. **Prior Administrative Findings of State Agency Psychological Consultants**

Lastly, Plaintiff faults the ALJ for "neither adopt[ing] nor reject[ing] the two state agency psychologists' opinions [that

---

[11] (...continued)
decision" and, regarding the EMG/NCV, found that "evidence d[id] not relate to the period at issue[ and, t]herefore, it d[id] not affect the decision about whether [Plaintiff] w[as] disabled beginning on or before July 24, 2019." (Tr. 2.) As a result of those findings, the Appeals Council did <u>not</u> exhibit that evidence (<u>see</u> Tr. 6-7), and it does not constitute a part of the administrative record properly before this Court.

29

Plaintiff had] moderate limitation in the ability to understand, remember, and carry out <u>detailed</u> instructions" despite finding their opinions "'persuasive.'" (Docket Entry 12 at 10 (emphasis added) (citing Tr. 124-25); <u>see also</u> Docket Entry 18 at 5.) As concerns that matter, Plaintiff notes that "the [VE] testified that the <u>simple</u> occupations adopted by the ALJ may involve <u>detailed</u> instructions." (Docket Entry 12 at 11 (emphasis added) (citing Tr. 170, <u>DOT</u>, Nos. 209.587-034 ("Marker"), 1991 WL 671802, 222.587-038 ("Router"), 1991 WL 672123, 222.687-022 ("Routing Clerk"), 1991 WL 672133 (reflecting that all three jobs require Reasoning Development Level 2 ("RDL 2")), and <u>DOT</u>, App'x C ("Components of the Definition Trailer"), 1991 WL 688702 (providing that RDL 2 requires ability to "[a]pply commonsense understanding to carry out <u>detailed</u> but uninvolved written or oral instructions" (emphasis added))).) That argument lacks merit for two reasons.

First, the state agency psychological consultants' moderate limitations in understanding, remembering, and carrying out detailed instructions appear in the portion of the mental RFC form which they use as "merely a worksheet to aid in deciding the presence and degree of functional limitations . . . [which] does not constitute the RFC assessment." Program Operations Manual System ("POMS") DI 24510.060B.2.a (bold font omitted). The state agency psychological consultants assess the actual mental RFC in the narrative portion of the form. <u>See</u> POMS DI 24510.060B.4.

30

Here, despite finding moderate limitations in understanding, remembering, and carrying out detailed instructions (see Tr. 221-22, 246-47, 273, 297), the initial-level state agency psychological consultant concluded in the narrative portion of the mental RFC form that Plaintiff retained the mental capacity to perform "simple, routine, and repetitive tasks at a non-production pace, in a position with reduced social demands" (Tr. 224, 249), and the reconsideration-level consultant found that Plaintiff could perform "simple routine tasks and function adequately in a stable work assignment in a position that is not highly production oriented or socially demanding." (Tr. 274, 298). Thus, the ALJ did not err by relying on the state agency psychological consultants' narrative mental RFC assessment. See Jones v. Commissioner of Soc. Sec., 478 F. App'x 610, 612 (11th Cir. 2012) (rejecting claimant's contention that ALJ should have accounted in RFC for moderate limitations identified on mental RFC assessment form, and noting that the limitations "are only part of a worksheet that does not constitute the doctors' actual RFC assessment" (brackets and internal quotation marks omitted)); Smith v. Commissioner of Soc. Sec., 631 F.3d 632, 636-37 (3d Cir. 2010) (finding no error where ALJ omitted from hypothetical question moderate limitations contained in worksheet part of mental RFC form, noting that such findings "may be assigned little or no weight," and further concluding that the claimant could not "rely on the worksheet component" of mental RFC form); Johansen v. Barnhart, 314 F.3d 283, 288-89 (7th Cir. 2002)

31

(upholding ALJ's reliance on specific mental RFC assessment that the claimant could perform low-stress, repetitive work, rather than subsidiary findings of moderate limitations in ability to maintain regular schedule and attendance and to complete normal workday and workweek without interruptions from psychologically-based symptoms); Schurr v. Colvin, Civ. No. 12-C-0969, 2013 WL 1949615, at *15 (E.D. Wis. May 9, 2013) (unpublished) ("The ALJ did not err in crediting the more specific, narrative portion of [the state agency consultant's] report, rather than the check-boxes.").

Second, no conflict arises between jobs requiring detailed instructions and a limitation to simple tasks under controlling Fourth Circuit precedent.  Social Security Ruling 00-4p, Policy Interpretation Ruling: Titles II and XVI: Use of [VE] and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (Dec. 4, 2000) ("SSR 00-4p") places an affirmative duty on an ALJ to elicit an explanation from the VE as to any "apparent unresolved conflict" between the VE's testimony and the DOT:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the [DOT].  When there is an apparent unresolved conflict between VE . . . evidence and the [DOT], the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the [ALJ's] duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not there is such consistency.

32

SSR 00-4p, 2000 WL 1898704, at *2 (emphasis added). "[A]n ALJ has not fulfilled his affirmative duty merely because the [VE] responds 'yes' when asked if her testimony is consistent with the [DOT]," Pearson v. Colvin, 810 F.3d 204, 208 (4th Cir. 2015) (internal quotation marks omitted); thus, "[t]he ALJ independently must identify . . . where the [VE's] testimony seems to, but does not necessarily, conflict with the [DOT]," id. at 209 (emphasis added); see also id. (rejecting the Commissioner's argument that an "apparent" conflict meant only an "obvious" one).

In Thomas v. Berryhill, 916 F.3d 307 (4th Cir. 2019), the Fourth Circuit relied on its earlier holding in Pearson and held that an apparent conflict existed between the VE's testimony that a claimant limited to short, simple instructions could perform three particular jobs categorized by the DOT as requiring RDL 2:

> We believe that [the claimant], being limited to short, simple instructions, may not be able to carry out detailed but uninvolved instructions. This is not a categorical rule - some instructions, particularly if they are well-drafted, may be simultaneously short, simple, detailed, and uninvolved. Even so, the conflict between [the claimant]'s limitation to short, simple instructions and the VE's testimony that [the claimant] could perform jobs that include detailed but uninvolved instructions is as apparent as the conflict we identified in Pearson. Since we held that an apparent conflict existed in Pearson, we are satisfied that one exists in this case, too. We remand so that the ALJ can resolve the conflict in accordance with the [SSA]'s regulations.

Thomas, 916 F.3d at 314 (emphasis added) (footnote omitted).

Shortly thereafter, however, the Fourth Circuit distinguished its holding in Thomas and found no conflict existed between jobs

33

requiring RDL 2 and a limitation to "simple" (as opposed to

"short") tasks or instructions:

> In *Thomas v. Berryhill*, this court found an apparent
> conflict between the claimant's [RFC], which limited her
> to jobs involving "<u>short</u>, simple instructions," and [RDL]
> 2's concept of "<u>detailed</u> but uninvolved instructions."
> 916 F.3d at 313–14. [The plaintiff] asserts that there
> is no meaningful difference between [the plaintiff in
> *Thomas*]'s [RFC] and hers, which limits her to "simple,
> routine, repetitive tasks." We disagree.
>
> Even assuming that "tasks" and "instructions" are
> synonymous, the key difference is that [the plaintiff in
> *Thomas*] was limited to "short" instructions. "Short" is
> inconsistent with "detailed" because detail and length
> are highly correlated. Generally, the longer the
> instructions, the more detail they can include.
>
> In contrast, the [ALJ] found that [the plaintiff] could
> perform jobs limited to "simple, routine repetitive tasks
> of unskilled work." There is no comparable inconsistency
> between [the plaintiff]'s [RFC] (as determined by the
> [ALJ]) and [RDL] 2's notions of "detailed but uninvolved
> . . . instructions" and tasks with "a few [ ] variables."
> [<u>DOT</u>], App['x] C, 1991 WL 688702.
>
> To begin with, detailed instructions are, in the main,
> less correlated with complexity than with length.
> Instructions often include many steps, each of which is
> straightforward. Driving directions are a good example:
> they may prescribe many turns, but the turns are
> generally easy to make, and the route rarely changes,
> making the directions simple, routine, and repetitive.
> Further, there is no conflict between "simple" and
> "uninvolved" instructions, as both connote instructions
> that "are not complicated or intricate." <u>Moore v.
> Astrue</u>, 623 F.3d 599, 604 (8th Cir. 2010) (citing
> *Webster's Third New Int'l Dictionary* 1191, 2499
> (2002)). . . .
>
> Thus, while there was an apparent conflict in *Thomas*,
> there is none here.

<u>Lawrence v. Saul</u>, 941 F.3d 140, 143-44 (4th Cir. 2019) (footnotes

omitted). In light of <u>Lawrence</u>, even had the ALJ expressly

34

included the state agency psychological consultants' moderate limitation in understanding, remembering, and carrying out detailed instructions in the RFC, that would not have precluded the RDL 2 jobs cited by the VE and adopted by the ALJ at step five.[12]

In short, Plaintiff's second issue on review fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment Reversing and Remanding the Decision of the Commissioner of Social Security (Docket Entry 11) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 16) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 23, 2021

---

[12] Significantly, a "moderate" limitation means mental "functioning in that area independently, appropriately, effectively, and on a sustained basis is <u>fair</u>," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F.2.c (emphasis added), and not that the individual possesses <u>no</u> useful ability to engage in that ability.

35